952 So.2d 60 (2006)
STATE of Louisiana
v.
Leo SCOTT.
No. 2006 KA 1103.
Court of Appeal of Louisiana, First Circuit.
December 28, 2006.
*62 Anthony G. Falterman, Donald D. Candell, Gonzales, for Appellee, State of Louisiana.
Holli Herrie-Castillo, Marrero, for Defendant/Appellant, Leo Scott.
Before: CARTER, C.J., WHIPPLE and McDONALD, JJ.
WHIPPLE, J.
The defendant, Leo Scott, Sr., was charged by bill of information with one count of second degree battery (count I), a violation of LSA-R.S. 14:34.1, and one count of simple kidnapping (count II), a violation of LSA-R.S. 14:45. He pled not guilty on both counts. Following a jury trial, he was found guilty as charged on both counts. On count I, he was sentenced to five years at hard labor. On count II, he was sentenced to five years at hard labor to run consecutively to the sentence imposed on count I.
He now appeals, designating the following four assignments of error:
(1.) The trial court erred in failing to admonish the jury to disregard Wilda Fontenot's testimony regarding the defendant being incarcerated;
(2.) The record is not complete to conduct an adequate review for assignments of error;
(3.) The State failed to provide sufficient evidence to support the verdicts of second degree battery and simple kidnapping; and
(4.) The trial court erred in imposing consecutive sentences.
Finding no merit to the assignments of error, we affirm the defendant's convictions and sentences.

*63 FACTS

The victim testified at trial and gave the following account of the incident. On March 1, 2004, she worked from 1:00 p.m. until 10:00 p.m. at the Siegen Lane Wal-Mart in Baton Rouge. After completing her shift, she drove a co-worker to her car, and then began driving home. The victim's vehicle's headlights began to dim. She knew that Walter Bureau had an industrial, big battery charger, so she went to his house to ask him to charge her vehicle's battery. Bureau agreed to charge the battery, but indicated the charger would need thirty to forty-five minutes to complete the charge. The victim waited in Bureau's living room, watching television and talking to Bureau.
Before the battery was ready, the defendant knocked on Bureau's door, Bureau unlocked the door, and the defendant also entered Bureau's home. As soon as the defendant saw the victim, he stated, "[W]hat the shit are you doing?[,]" and began punching her on her head and face with his hands, arms, and fists. The victim fell from the sofa and onto the floor, but the defendant continued to punch her. Bureau went to a neighbor's house and alerted the police. While bleeding profusely, the victim got up to search for a towel or something to staunch the blood. When she stopped to wipe her face, the defendant told her, "Come on. You coming (sic) with me." He then grabbed her by her shirt and forcibly pulled her out of Bureau's house. The victim fell, but the defendant forced her to accompany him by pushing and kicking her into his daughter's vehicle. The defendant then drove away with her. While they drove, the defendant threatened to kill the victim, questioned why she had not sent him money while he was incarcerated, and told her, "I ought to kill you. I just ought to kill you."
The defendant took the victim to the Budget Inn Motel and yelled at her, asking, "[W]hy didn't you send me money?[,]" and "[W]hy don't you stick by my side?" The victim could not remember how long he kept her at the motel because she passed in and out of consciousness during that time. She was also in severe pain and vomiting. Thereafter, the defendant left the victim at the motel, but returned with a man and a woman. The woman asked the victim if she wanted to go to the hospital. The victim declined, stating she just wanted to go to her car and go home. Ultimately, the defendant called Bureau and told him he was going to take the victim back to her car.
The victim later went to the emergency room and learned she had multiple fractures to her head, face, and nose. She denied that she was drinking and doing "crack" with Bureau when the defendant came into Bureau's home.
Walter Bureau testified that on March 1, 2004, at approximately 1:15 a.m., the victim came to his home on Airline Highway in Baton Rouge because her vehicle's alternator was not working. Bureau charged the victim's battery, and he and the victim sat and talked while the battery charged. They were disturbed by the defendant coming to the door. The defendant came into the house and began beating the victim with his fists. Bureau went to a neighbor's house to summon the police.
Bureau conceded he had a rifle with him when he answered the defendant's knock on the door. He indicated he put the rifle down, however, when he saw who was at the door because he had known the defendant since he was a child. Bureau denied that he and the victim were doing "crack" when the defendant disturbed them. He also denied struggling with the defendant *64 for the rifle and denied that the rifle struck the victim.
Dr. Gary Moll testified that on March 1, 2004, at approximately 3:16 p.m., he treated the victim in the emergency room of St. Elizabeth Hospital. The victim reported being in an altercation during the night. She indicated she had been hit in the face and eyes, and suffered pain, blurry vision, but no loss of consciousness. The victim also indicated her nose had been bleeding and that she had vomited once. The victim had extensive swelling and bruising around her right eye and around and inside her nose. She indicated her pain level was "7 over 10." A CAT scan of her facial bones revealed approximately six different fractures of her face and nasal cavities. Dr. Moll felt that the victim needed to be evaluated by a plastic surgeon and an ophthalmologist to determine whether she needed surgical repair of her facial fractures and to determine whether she had suffered any kind of retinal damage to her eye.
The defendant also testified at trial. He indicated he was 6'1" tall and weighed 227 lbs. He claimed he had been "on and off' friends with the victim since 1978 and that they had lived together at different times. He conceded he went to Bureau's house on the night in question, but denied assaulting the victim. He claimed he was afraid of the victim because she had stabbed him before when she was using drugs. He claimed when he went into Bureau's house, the victim was "all spaced out" and her blouse was open. He claimed there was a crack pipe and four rocks of crack cocaine on the coffee table. According to the defendant, he slapped the cocaine off the table and began struggling with Bureau for the rifle Bureau was carrying. The defendant claimed he told the victim to sit down and stay out of the way, but the barrel of the rifle hit her in the face. The defendant claimed that his finger was also injured when Bureau took the rifle out of the defendant's hand and that "half of the blood" in Bureau's house was the defendant's blood.
The defendant also denied kidnapping the victim. He conceded he drove off with the victim, but claimed she asked him to take her to the hospital. He claimed the victim then asked him to take her to a motel to put ice on her face because she was "loaded on crack cocaine" and did not want anyone to see her face. He claimed the victim threatened him, "Well, you tell my people I'm on crack cocaine, I'm going to tell them you beat me up like this here." The defendant claimed he then took the victim back to Bureau's house.

SUFFICIENCY OF THE EVIDENCE
In assignment of error number 3, the defendant contends the evidence was insufficient to support the conviction. Specifically, he contends that the testimony of the victim conflicted with the testimony of Bureau concerning when the victim left work and conflicted with the testimony of Dr. Moll concerning whether or not the victim had lost consciousness and how many times the victim had vomited following the alleged attack.
The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove, in order to convict," every reasonable hypothesis of innocence is excluded. State v. *65 Wright, 98-0601, p. 2 (La.App. 1st Cir.2/19/99), 730 So.2d 485, 486, (quoting LSA-R.S. 15:438), writs denied, 99-0802 (La.10/29/99), 748 So.2d 1157, XXXX-XXXX (La.11/17/00), 773 So.2d 732.
When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Wright, 98-0601 at p. 3, 730 So.2d at 487.
Battery includes the intentional use of force or violence upon the person of another. LSA-R.S. 14:33. Second degree battery is a battery committed without the consent of the victim when the offender intentionally inflicts serious bodily injury. Serious bodily injury means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death. LSA-R.S. 14:34.1 Simple kidnapping is the intentional and forcible seizing and carrying of any person from one place to another without his consent. LSA-R.S. 14:45(A)(1).
After a thorough review of the record, we are convinced the evidence presented herein, viewed in the light most favorable to the State, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree battery and simple kidnapping, and the defendant's identity as the perpetrator of those offenses against the victim. The verdicts rendered against the defendant indicate the jury accepted the victim's account of these events. On review, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. The testimony of the victim alone is sufficient to prove the elements of the offense. As the trier of fact, the jury was entitled to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Lofton, 96-1429, p. 5 (La.App. 1st Cir.3/27/97), 691 So.2d 1365, 1368, writ denied, 97-1124 (La.10/17/97), 701 So.2d 1331.
This assignment of error is without merit.

MISTRIAL
In assignment of error number 1, the defendant contends the trial court erred in failing to admonish the jury to disregard the testimony of the victim and in failing to grant a mistrial after the victim gave irrelevant or immaterial testimony prejudicial to the defendant.
Louisiana Code of Criminal Procedure article 771, provides, in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

*66 . . .
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
A mistrial under the provisions of Code of Criminal Procedure article 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. Unsolicited and unresponsive testimony is not chargeable against the State to provide a ground for mandatory reversal of a conviction. Furthermore, a statement is not chargeable to the State solely because it was in direct response to questioning by the prosecutor. While a prosecutor might have more precisely formulated the question that provoked a witness's response, where the remark is not deliberately obtained by the prosecutor to prejudice the rights of the defendant, it is not the basis for a mistrial. State v. Tran, 98-2812, pp. 3-4 (La.App. 1st Cir.11/5/99), 743 So.2d 1275, 1280, writ denied, 99-3380 (La.5/26/00), 762 So.2d 1101.
At trial, the following colloquy between the State and the victim occurred:
Q. Let's talk about when [the defendant] grabbed you and he put you in the car or whatever, kicked you and 
A. Yes, sir.
Q. What happened at that point?
A. At that point, he just left Walter's home, and we rode and rode and rode, and we went to Budget Inn Motel. He did stop for ice at the Shell station on Highway 30.
Q. Did he say anything to you while you were riding?
A. He  he didn't hit me anymore, but he would just holler and fuss at me.
Q. What was he hollering?
A. Just why didn't you send me any money while I was incarcinated [sic] (spelled phonetically), and why didn't you do this and why didn't you do that, and just  just hollering.
Q. Did at any time he threaten your life?
A. Yes, he did say he would  he would kill me.
Q. When?
A. During the time he was beating me at Walter's home.
Q. And what did he say about killing you?
A. "I ought to kill you. I just ought to kill you." And that's  was his words.
Q. Okay. Before he began beating you in Walter's house, had you said anything to him?
A. I had no time to say nothing.
Q. And before you even saw him at Walter's house, can you tell the jury, when was the last time you had seen him?
A. It had been  our relationship really had been off and on because  since my father died three years ago. I mean, we were just  I'd go see him on occasions, but it was nothing really foundation at all.
Q. Okay. But we're talking about him attacking you and beating you on March 1st. Okay? Before that day, when was the last time you had seen him?
A. It's probably five months 
Q. Five months before March?
A.  at least. Yeah.

*67 Q. So, if we back that up 
A. Right.
Q.  October or November of 2003?
A. Exactly.
Q. I mean, I'm trying to 
A. It was a short while before he was incarcinated [sic].
Thereafter, outside the presence of the jury, the defense moved for a mistrial on the basis of the victim's reference to the defendant's incarceration. The State argued the comment was inadvertently made. The trial court denied the motion for mistrial, but did not admonish the jury to disregard the challenged testimony. However, the court did instruct the victim not to refer to any crimes other than the ones presently before the court. The defense objected to the court's ruling.
On review, we find no abuse of discretion by the trial court in its denial of the motion for mistrial. The victim's references to the defendant's prior incarceration were not deliberately obtained by the prosecutor to prejudice the rights of the defendant. Instead, the challenged testimony and reference to other crimes evidence was both relevant and material. The defendant apparently was angry with the victim because she had failed to send him money or "stick by [his] side" while he was incarcerated. The reference established the defendant's motive and intent in attacking and kidnapping the victim and was admissible as relating to conduct that constituted an integral part of the charged offenses. See LSA-C.E. art. 404(B)(1); State v. Bilbo, 97-2189, pp. 7-10 (La.App. 1st Cir.9/25/98), 719 So.2d 1134, 1138-39, writ denied, 98-2722 (La.2/5/99), 737 So.2d 747.
This assignment of error is also without merit.

INCOMPLETE RECORD
In assignment of error number 2, the defendant argues certain bench conferences concerning objections to certain photographs depicting the victim's injuries were not recorded, thereby violating the defendant's right to full appellate review.
Louisiana Constitution article I section 19, guarantees defendants a right of appeal "based upon a complete record of all evidence upon which the judgment is based." State v. Hoffman, 98-3118, p. 49 (La.4/11/00), 768 So.2d 542, 586, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). Additionally, LSA-C.Cr.P. art. 843, in pertinent part, provides:
In felony cases, . . . the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. See State v. Robinson, 387 So.2d 1143 (La.1980) (reversal required when record failed to contain the testimony of a State and defense expert witness); State v. Ford, 338 So.2d 107 (La.1976) (reversal required when record missing the testimony of four State witnesses and the voir dire of prospective jurors). On the other hand, inconsequential omissions or slight inaccuracies do not require reversal. State v. Goodbier, 367 So.2d 356, 357 (La. 1979) (reversal not required when record does not include a transcript of the voir dire examination and affidavit of court reporter indicated that counsel made no objections during voir dire). Hoffman, 98-3118 at pp. 49-50, 768 So.2d at 586.
*68 The Louisiana Supreme Court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of LSA-C.Cr.P. art. 843. However, article 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke article 843. Similarly, Article I, § 19's command to record "evidence" does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of LSA-C.Cr.P. art. 843. Hoffman, 98-3118 at p. 50, 768 So.2d at 586-87.
In support of the instant argument, the defendant first cites the unrecorded bench conference held after the State offered State Exhibit # 1, a photograph of the victim's face showing bruises to her eyes and right cheek, into evidence. Following the bench conference, the court stated, "Let it be received into evidence, marked accordingly. No objection."
The defendant next cites the unrecorded bench conference held after the State offered State Exhibit # 3, a photograph of the lower portion of the victim's face showing a bruise to her right cheek and redness on her neck, into evidence. Following the bench conference, the court stated, "I'm going to allow it into evidence. Mark it accordingly."
Lastly, the defendant cites the unrecorded bench conference held after the State offered State Exhibit # 10, a photograph of blood on the floor in front of the couch where the defendant allegedly attacked the victim, into evidence. Immediately prior to the bench conference, the defense stated, "Your, Honor, we renew our objection for the same reasons."
In regard to the unrecorded bench conferences at issue, the defendant fails to demonstrate any specific prejudice which he suffered as a result of those conferences not being transcribed; nor does anything in the record suggest that the conferences had any discernible impact on the proceedings. Accordingly, no reversible error occurred. See State v. Deruise, 98-0541, p. 15 (La.4/3/01), 802 So.2d 1224, 1236, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001); Hoffman, 98-3118 at pp. 50-51, 768 So.2d at 587.
This assignment of error is also without merit.

CONSECUTIVE SENTENCES
In assignment of error number 4, the defendant argues the sentences must be set aside because the trial court failed to provide the specific reasons for imposing consecutive sentences. He argues that when the trial court fails to state the factors considered and the reasons for consecutive terms, the Louisiana Supreme Court generally vacates sentences and remands for resentencing, citing State v. Sherer, 437 So.2d 276 (La.1983) (per curiam) and State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980).
Louisiana Code of Criminal Procedure article 883 provides, in pertinent part:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.
Although LSA-C.Cr.P. art. 883 favors imposition of concurrent sentences *69 for crimes committed as part of the same transaction or series of transactions, a trial court retains the discretion to impose consecutive penalties in cases in which the offender's past criminality or other circumstances in his background or in the commission of the crimes justify treating him as a grave risk to the safety of the community. State v. Walker, XXXX-XXXX, p. 1 (La.10/12/01), 799 So.2d 461, 461-62 (per curiam); see State v. Jones, XXXX-XXXX, p. 5 (La.App. 1st Cir.3/24/05), 907 So.2d 139, 143 ("Additionally, given the obvious danger posed to the public by the defendant's repeated drunken driving, consecutive sentences were justified in this case.")
Prior to sentencing the defendant, the trial court referenced the pre-sentence investigation report (PSI) and indicated it had considered several letters filed on behalf of the defendant, but not contained in the report. The PSI recommended that the defendant be sentenced to maximum consecutive sentences.
In sentencing the defendant, the court noted that: the defendant was officially classified as a second felony offender; on or about March 1, 2004, he punched the victim in the face, physically forced her out of the residence where she had been visiting, forced her into a car, and drove around for several hours while her nose bled profusely; the investigating detective stated the victim's right eye was swollen shut, she had bruising under her left eye, and her lips were busted; and in her statement, the victim indicated she was blinded for fourteen days as a result of the incident.
Referencing the sentencing considerations of LSA-C.Cr.P. art. 894.1, the court further found: there was an undue risk that during the period of a suspended sentence or probation, the defendant would commit another crime; the defendant was in need of correctional treatment or a custodial environment that could be provided most effectively by his commitment to an institution; a lesser sentence than the sentence to be imposed would deprecate the seriousness of the offense; the defendant's conduct during the commission of the offense manifested deliberate cruelty to the victim; the offense was a violent offense in which the victim was brutally attacked and forced from a place where she was visiting; the defendant created a risk of bodily harm to more than one person; the defendant used actual violence in the commission of the offense; the offense resulted in significant physical injury to the victim's face; there was a total lack of provocation for the offense, in that there were no grounds tending to justify or excuse the defendant's conduct; the court had not been provided with any information that would indicate that the victim of the offense induced or facilitated its commission in any way; it did not appear that the defendant had compensated the victim; the defendant had not led a law-abiding life for a substantial period of time before the commission of the offense. The court further noted that although only classified as a second felony offender, the defendant had been arrested on numerous occasions for crimes of violence, many of which had involved the use of dangerous weapons; the defendant's criminal record dated back to 1976 and included aggravated battery with a dangerous weapon, forcible rape, sexual battery, aggravated assault, simple robbery, simple battery, armed robbery, first degree murder, aggravated burglary, resisting an officer, and possession of a firearm; and imprisonment of the defendant would not result in any excessive hardship to the defendant or his dependents.
Sherer involved a conviction of one count of negligent homicide and a five-year sentence and an adjudication as a habitual *70 offender on another count of negligent homicide and an enhanced sentence of seven years under the habitual offender law to run consecutive to the five-year sentence. Sherer, 437 So.2d at 276. The court in Sherer vacated the sentences and remanded for resentencing with a full statement of reasons for the particular sentences imposed. Sherer, 437 So.2d at 277. The court noted:
Because the function of the consecutive sentence should be similar to the sentence imposed on habitual or dangerous offenders, sentences for crimes arising from a single course of conduct should be concurrent rather than consecutive, absent a showing that the offender poses an unusual risk to the safety of the public. See State v. Franks, 373 So.2d 1307 (La.1979); State v. Cox, 369 So.2d 118 (La.1979). Cf. [La.Code Crim. P. art.] 883. We cannot presume that the sentencing judge viewed the defendant as an unusual risk to the safety of the public because he did not so state. Instead, the judge expressed his belief that the defendant had become virtually rehabilitated and should be released on parole at the earliest possible time. For these reasons, the imposition of consecutive rather than concurrent sentences totaling 12 years at hard labor upon a defendant deemed parole-eligible by the sentencing judge for crimes of criminal negligence, rather than intentional offenses, arising from a single course of conduct, are unexplained by the judge's statements and unillumined by this problematic record. (Emphasis added).
Id.
The court in Ortego found the trial court failed to "state for the record the considerations taken into account and the factual basis therefor in imposing sentence." See LSA-C.Cr.P. art. 894.1(C). Ortego, 382 So.2d at 923. On the face of the record, however, the court in Ortego did not find that the imposition of two consecutive twenty-year sentences for armed robbery arising out of a single incident was necessarily excessive, but remanded for the trial court's resentencing and articulation under Article 894.1. Ortego, 382 So.2d at 924.
Unlike the circumstances noted in Sherer and Ortego, in the instant case, there was no abuse of discretion in the imposition of consecutive sentences. The instant record fully supports consecutive sentences for the defendant  a repeat offender, who brutally and without provocation attacked a defenseless woman and caused significant physical injury to her face. As the sentencing court correctly concluded, the defendant presents a grave risk to the safety of the community. Further, the trial court adequately complied with LSA-C.Cr.P. art. 894.1(C).
This assignment of error is also without merit.

CONCLUSION
For the above reasons, defendant's convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.