STATE OF LOUISIANA
v.
ELIZABETH ZACHARY.
No. 2007 KA 0678.
Court of Appeal of Louisiana, First Circuit.
December 21, 2007.
NOT DESIGNATED FOR PUBLICATION.
SCOTT M. PERRILLOUX, District Attorney, Counsel for Plaintiff/Appellee, State of Louisiana.
LEANNE MALNAR, Assistant District Attorney, MOLLY L. BALFOUR, Assistant Attorney General, M. MICHELE FOURNET, Counsel for Defendant/Appellant, Elizabeth Zachary.
Before CARTER, C.J., PETTIGREW and WELCH, JJ.
CARTER, C.J.

PROCEDURAL HISTORY
The defendant, Elizabeth Zachary, was charged by grand jury indictment with first degree murder, a violation of LSA-R.S. 14:30, and pled not guilty. Thereafter, the indictment was amended to charge the defendant with obstruction of justice, a violation of LSA-R.S. 14:130.1, and the defendant pled not guilty. A jury found the defendant guilty as charged.
The State filed a habitual offender bill of information, therein alleging the defendant was a second-felony habitual offender. In response, the defendant filed her first motion to quash the habitual offender bill. Following a hearing, the trial court declined to invoke the provisions of the habitual offender law and sentenced the defendant to ten years at hard labor. The defendant moved for reconsideration of her sentence, but the motion was denied. The State moved to reopen the hearing on the habitual offender bill, but the trial court denied the motion. Thereafter, this court granted the State's application for a supervisory writ, vacated the order denying the State's motion, and remanded the matter for a determination as to whether the defendant was a habitual offender and, if so, for resentencing. State v. Zachary, 00-0579 (La. App. 1 Cir. 4/24/00).
Following a hearing, the trial court found the evidence presented by the State to be constitutionally insufficient to find the defendant to be a habitual offender. The defendant filed a second motion to quash the habitual offender bill, and the trial court granted the motion. The State filed an application for supervisory writs, which this court denied. State v. Zachary, 01-2225 (La. App. 1 Cir. 11/5/01). Thereafter, the Louisiana Supreme Court reversed the trial court's granting of the first motion to quash the habitual offender proceedings. State v. Zachary, 01-3191 (La. 10/25/02), 829 So.2d 405 (per curiam). Subsequently, on remand from the supreme court, this court reversed the granting of the second motion to quash and remanded the case to the trial court for completion of the habitual offender proceedings. State v. Zachary, 01-2225R (La. App. 1 Cir. 6/16/03).
The defendant filed a third motion to quash the habitual offender bill.[1] Following a hearing, the trial court found the defendant to be a second-felony habitual offender. The defendant was sentenced to twenty years at hard labor without benefit of probation or suspension of sentence.[2] The previously imposed sentence was vacated, and the time the defendant actually had served was deducted from the new sentence. The defendant now appeals, designating ten assignments of error. For the reasons that follow, we affirm the conviction, habitual offender adjudication, and sentence.

FACTS
On July 9, 1993, at approximately 9:30 p.m., the Walker Police Department responded to a report of a suspicious person at the Interstate Mini-Storage on Walker South Road. At that location, the police found Paul Weber sitting on the side of the building and the defendant seated in the driver's seat of the vehicle of the victim, George T. Taylor. Both Weber and the defendant were intoxicated. Keys to the vehicle and to the victim's home were on the defendant's lap. The victim's wallet was on the floor in the rear of the vehicle. Grass and weeds were caught under the front bumper of the vehicle, and approximately 20 feet from the vehicle, the police discovered a dry rolled-up rug lying in wet grass. When the police unrolled the rug, they noticed a large amount of wet blood.
While the defendant was being booked for public intoxication, a corrections officer noticed that the legs of her jeans were splattered with fresh blood. Jail policy required injured prisoners to be taken to the hospital, so the corrections officer asked the defendant if she was injured. The defendant replied, "[N]o, ma'am, it's not my blood. It's someone else's."
The police went to the defendant's home and knocked on the unlocked door, but no one answered. They discovered blood on the outside of the steps and, fearing that the defendant's children might have been injured, went inside the home. There was blood splattered on the living room floor and on a wall. Blood and fresh, loose particles of dirt were found on the sofa. The rug in the defendant's bedroom matched the rug found near the victim's vehicle.
On the morning of July 10, 1993, the victim's body was discovered wrapped in a bedspread in tall grass, approximately one and three-tenths miles from the defendant's house. The victim suffered two fatal injuries, blunt head trauma and a stab wound in the chest. He also suffered a nonfatal stab wound close to his spine.
Kathy Bernard and Donna Peters met the defendant in jail and testified at trial. Bernard testified the defendant told her that she (the defendant) and Weber had invited the victim to the defendant's house on July 9, 1993. According to Bernard, the defendant stated that she saw Weber hit the victim with a shovel after they got into an argument. The defendant told Bernard that she helped Weber roll the victim's body in a rug, place the body into the trunk of a car, and dump the body. The defendant and Weber then drove around until they were arrested. According to Bernard, the defendant stated she helped Weber because she loved him. Peters offered similar testimony, adding that although the defendant never told her that Weber threatened her (the defendant), the defendant did indicate she was scared and upset at the time of the incident.
The defendant's July 12, 1993, 8:25 a.m., audiotaped statement was played for the jury at trial. In the statement, the defendant stated she had known the victim for less than a week before the incident. She claimed that two days before the incident the victim had invited her and Weber to his house, where they drank beer together. The victim dropped Weber off and then drove with the defendant toward his house. The defendant stated she became frightened and told the victim she needed cigarettes so that he would take her to a store, but the victim drove her to his house anyway. The defendant claimed she telephoned her neighbor and asked him to come and get her from the victim's house, but the neighbor refused. The victim apologized for not taking her to the store and drove her to a gas station. The defendant called her neighbor from the gas station, and her neighbor picked her up. According to the defendant, the next day the victim called her house several times asking if she would clean and cook for him, and she told him that she would consider the offer.
The defendant maintained that on the night of the incident, the victim just showed up at her house. She stated that the victim was fine when she went into the bathroom to adjust her contact lens. However, when she came out of the bathroom, the victim was on the rug in a pool of blood, and Weber was beating him with a shovel. She also claimed Weber forced another object into the victim with the shovel. The defendant claimed she was scared, frightened, and terrified of Weber. She claimed he yelled at her and, in a menacing, threatening tone, told her not to use the telephone. The defendant claimed Weber rolled the victim's body in the rug, put the rug into the victim's car, and ordered her into the car. She stated she did not know where Weber dumped the body.
When asked how she got blood on her knees, the defendant stated it was possible that she had helped Weber carry the rug out. She claimed she did not remember what had happened after the body was dumped and must have "blanked" out. When asked if Weber had indicated why he had hit the victim, the defendant claimed Weber told her the victim would not bother her again.

TIMELINESS OF HABITUAL OFFENDER ADJUDICATION
In assignment of error number 1, the defendant argues that the imposition of an enhanced sentence more than four years after the completion of her initial sentence, toward the end of her parole supervision, and in light of her rehabilitation since release, violated her right to a habitual offender hearing within a reasonable time and her constitutional right to a speedy trial.
Proceedings under a habitual offender bill filed pursuant to LSA-R.S. 15:529.1 need not be completed prior to the time the defendant satisfies the original sentence imposed by the trial court. State v. Muhammad, 03-2991 (La. 5/25/04), 875 So.2d 45, 54. Although the habitual offender law, LSR.S. 15:529.1, does not specify a time within which a habitual offender bill of information must be filed, the district attorney must file the habitual offender bill within a reasonable time. Id.
The Louisiana Supreme Court also has held that a case-by-case evaluation is warranted to determine whether a habitual offender proceeding has been promptly concluded. Muhammad, 875 So.2d at 55. In evaluating whether delays in concluding the proceeding are unexplained or extraordinarily long, courts may look to relevant speedy trial considerations, including the length of the delay, the reasons for the delay, the accused's assertion of her right to speedy trial, and the prejudice to the accused resulting from the delay. Id. While these factors are neither definitive nor dispositive in the context of a habitual offender proceeding, they are instructive in determining whether the habitual offender hearing is held and the proceeding completed within a reasonable time. Id. "Abusive or vindictive delay should not be tolerated." Id.
The defendant was convicted of obstruction of justice on January 9, 1998; sentencing was set for March 26, 1998. On February 19, 1998, the State filed a habitual offender bill of information alleging the defendant was a second-felony habitual offender. On March 26, 1998, the trial court advised the defendant of her rights under the habitual offender law, gave the defense fifteen days to file objections to the habitual offender bill, and set the matter for a hearing on May 7, 1998. At that hearing, the defense filed its first motion to quash the habitual offender bill of information. Over the course of these proceedings, the defense filed two more motions to quash the habitual offender bill of information. The State sought review of the trial court's unfavorable rulings on the first two motions, both of which resulted in reversal of the trial court's judgments. See State v. Zachary, 00-0579 (La. App. 1 Cir. 4/24/00); State v. Zachary, 01-2225 (La. App. 1 Cir. 11/5/01). State v. Zachary, 01-3191 (La. 10/25/02), 829 So.2d 405 (per curiam); State v. Zachary, 01-2225R (La. App. 1 Cir. 6/16/03).
The habitual offender bill of information was filed against the defendant within a reasonable timeapproximately one month after the defendant's conviction. The initial habitual offender hearing also was held within a reasonable timewithin three months of the filing of the habitual offender bill of information. Following this court's June 2003 decision, the matter was set for sentencing on September 15, 2003. The defendant then filed her third motion to quash the habitual offender bill of information. The third motion to quash was continued at defendant's request, and it was the State that moved, on February 22, 2005, to reopen the habitual offender issue. The matter was set for June 1, 2005, and the defendant moved for a continuance. The habitual offender adjudication was fmally completed on October 26, 2005
The delay in completing the habitual offender adjudication cannot be attributed to bad faith or vindictiveness of the part of the State. Rather, the delay is attributable to the defendant's exercise of her right to seek to quash the bill of information and the State's exercise of its right to seek review of adverse trial court rulings with this court and with the Louisiana Supreme Court.
This assignment of error is without merit.

EXCESSIVE SENTENCE
In assignment of error number 2, the defendant argues imposition of the mandatory minimum sentence under the habitual offender law was excessive and constituted cruel and unusual punishment.
The defendant failed to make or file a motion to reconsider sentence in accordance with LSA-C.Cr.P. art. 881.1. Accordingly, review of the instant assignment of error is procedurally barred. LSA-C.Cr.P. art. 881.1E; State v. Duncan, 94-1563 (La. App. 1 Cir. 12/15/95), 667 So.2d 1141, 1143 (en banc per curiam).

SENTENCING UNDER LSA-R.S. 14:130.1B(1); SUFFICIENCY OF INDICTMENT; CONSTITUTIONALITY OF LSA-R.S. 14:130.1 UNDER APPRENDI
In assignment of error number 3, the defendant argues the trial court erred in sentencing the defendant under LSA-R.S. 14:130.1B(1). In assignment of error number 4, the defendant argues the amendments to the indictment resulted in a violation of her right to be informed of the nature and cause of the accusation against her and the rule of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In assignment of error number 5, the defendant argues LSA-R.S. 14:130.1 violates the rule of Apprendi by giving the sentencing judge the authority to decide the grade of the offense.
An accused in a criminal prosecution has a right to be informed of the nature and cause of the accusation against him. LSA-Const. art. I, § 13. If the sufficiency of an indictment is not questioned at trial, the indictment is sufficient unless it is so defective that it does not, by any reasonable construction, set forth an identifiable offense against the laws of this state and inform the defendant of the statutory basis of the offense. State v. Bass, 509 So.2d 176, 178 (La. App. 1 Cir. 1987). Elements of an offense must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt. Jones v. United States, 526 U.S. 227, 232, 119 S.Ct. 1215, 1219, 143 L.Ed.2d 311 (1999). Any fact (other than a prior conviction) that increases the maximum penalty[3] for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. Apprendi, 530 U.S. at 476, 120 S.Ct. at 2355; Jones, 526 U.S. at 243 n.6, 119 S.Ct. at 1224 n.6.
Subsection B of LSA-R.S. 14:130.1 specifies the applicable penalties for an obstruction of justice conviction. Specifically:
Whoever commits the crime of obstruction of justice shall be subject to the following penalties:
(1) When the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, the offender shall be fined not more than one hundred thousand dollars, imprisoned for not more than forty years at hard labor, or both.
(2) When the obstruction of justice involves a criminal proceeding in which a sentence of imprisonment necessarily at hard labor for any period less than a life sentence may be imposed, the offender may be fined not more than fifty thousand dollars, or imprisoned for not more than twenty years at hard labor, or both.
(3) When the obstruction of justice involves any other criminal proceeding, the offender shall be fined not more than ten thousand dollars, imprisoned for not more than five years, with or without hard labor, or both.
The nature of the underlying criminal proceeding, for purposes of determining the applicable section of the obstruction of justice statute, LSA-R.S. 14:130.1, should be determined by the date on which the act of obstruction occurred. State v. McKnight, 98-1790 (La. App. 1 Cir. 6/25/99), 739 So.2d 343, 353, writ denied, 99-2226 (La. 2/25/00), 755 So.2d 247.
The defendant and Paul Weber were charged by grand jury indictment as having committed "first degree murder of George Taylor, in violation of Article R.S. 14:30 of the Louisiana Criminal Code," a crime that may be punished by death or life imprisonment. The indictment was amended on February 27, 1997, to charge the defendant as follows:
On or about 7/9/93 Elizabeth Zachary committed the crime of obstruction of justice in that she tampered with evidence of the murder of George Taylor with the specific intent of distorting the results of the criminal investigation &/or prosecution of the murder of George Taylor in violation of LRS 14:130.1. (Emphasis supplied.)
On January 6, 1998, the indictment again was amended to replace the phrase "of the murder of George Taylor" with the phrase "of the death of George Taylor." After the January 6, 1998, indictment had been read to the jury and prior to opening arguments, the trial court stated:
Let me make one correction on here. It was corrected in one place but not another place. The Clerk read it correctly. It referred to the murder of George Taylor, and that's incorrect. We're dealing now with the death of George Taylor, a homicide, which is the killing of a human being. But that's it.
Although indicted for first degree murder, Weber ultimately pled guilty to manslaughter, a crime that carries "a sentence of imprisonment necessarily at hard labor for a period less than a life sentence." See LSA-R.S. 14:130.1B(2); LSA-R.S. 14:31. The State's acceptance of Weber's guilty plea to manslaughter did not preclude the State from trying the defendant for the crime of obstruction of justice involving an offense greater than manslaughter. Determining whom, when, and how to prosecute are matters within the discretion of the district attorney. See LSA-Const. art. V, §26(B); LSC.Cr.P. art. 61. With the consent of the district attorney, a defendant may plead to a lesser offense that is included in the offense charged in the indictment. LSA-C.Cr.P. art. 558. The district attorney, in the exercise of his discretion, accepted a manslaughter plea from Weber on a charge of first degree murder. That decision did not limit the district attorney from exercising his discretion and prosecuting the defendant herein for obstruction of justice regarding an offense greater than manslaughter.
We also reject the defendant's claim that the amendments to the indictment violated her right to be informed of the nature and cause of the accusation against her. For approximately eleven months prior to the amendment of the indictment at trial, the defendant was specifically charged with tampering with evidence concerning the murder of George Taylor. Even after the amendment of the indictment, the record indicates the defense was well aware of the fact that the defendant was being tried for obstruction of justice in connection with an offense in which a sentence of death or life imprisonment could be imposed. See LSA-R.S. 14:130.1B(1). Defense counsel advised the jury that obstruction of justice can carry up to forty years. See id. Defense counsel also referred to the victim's killing as a "murder" in opening and closing arguments.
Considering all of these factors, it was not essential that the indictment state that the defendant tampered with evidence in connection with, specifically, the first degree or second degree murder of the victim in order to determine the grade of the offense. Even if the failure to specifically refer to first degree or second degree murder in the indictment was error, substantial rights of the accused were not affected, and the omission was harmless. See LSA-C.Cr.P. art. 921; United States v. Clinton, 256 F.3d 311, 315-316 (5th Cir.), cert. denied, 534 U.S. 1008, 122 S.Ct. 492, 151 L.Ed.2d 404 (2001) (Apprendi errors subject to harmless error analysis). So concluding, it is unnecessary for this court to address the challenge to the constitutionality of LSA-R.S. 14:130.1. Courts should refrain from reaching the constitutionality of legislation unless the issue is essential to the case or controversy. Plainview Area Association v. State, 05-0791 (La. 4/29/05), 900 So.2d 837, 838 (per curiam).

SUFFICIENCY OF LIST OF RESPONSIVE VERDICTS
In assignment of error number 6, the defendant argues the trial judge erred in failing to include responsive verdicts identifying the underlying criminal proceeding as a specific grade of murder, manslaughter, or a designated relative felony or misdemeanor, along with attempts to commit these offenses. She further argues that the failure of her trial counsel to object to the inadequate responsive verdicts constituted ineffective assistance of counsel.
The verdict form submitted to the jury listed the responsive verdicts as: (1) Guilty of Obstruction of Justice; (2) Guilty of Attempted Obstruction of Justice; and (3) Not Guilty. The court instructed the jury as follows in regard to the penalty for obstruction of justice:
Whoever commits the crime of obstruction of justice shall be subject to the following penalties: When the obstruction of justice involves a [proceeding], in this case the offender shall be fined not more than one hundred thousand dollars, imprisoned for not more than forty years at hard labor, or both.
Later, upon receipt of a note from the jury, the court again read the same instruction regarding the penalty for obstruction of justice. The jury found the defendant guilty of obstruction of justice.
There is no formal requirement as to the language of the verdict except that it must clearly convey the intention of the jury. LSA-C.Cr.P. art. 810; State v. Young, 469 So.2d 1014, 1021 (La. App. 1 Cir. 1985). When faced with an ambiguous verdict, the intent of the jury can be determined by reference to the pleadings, the evidence, the admissions of the parties, the instructions, or the forms of the verdict the court submitted. Young, 469 So.2d at 1021. The responsive verdicts presented to the jury herein were consistent with the evidence presented at trial, and the verdict was clear.
Finally, we reject the defendant's claim that the failure of trial counsel to object to the responsive verdicts presented to the jury constituted ineffective assistance of counsel. Ineffective assistance of counsel claims are analyzed under the two-pronged test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish that her trial attorney was ineffective, the defendant must first show that the attorney's performance was deficient, which requires a showing that counsel made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment. Secondly, the defendant must prove that the deficient performance prejudiced the defense. This element requires a showing that the errors were so serious that the defendant was deprived of a fair trial; the defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show that the error had some conceivable effect on the outcome of the proceeding. Rather, he must show that, but for the counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. State v. Serigny, 610 So.2d 857, 859-860 (La. App. 1 Cir. 1992), writ denied, 614 So.2d 1263 (La. 1993).
Neither Apprendi nor Jones had been decided at the time of trial. Accordingly, defense counsel did not render deficient performance by failing to object to the responsive verdicts presented to the jury on the basis of the holdings in those two cases. Because the defendant has made an inadequate showing that defense counsel rendered a deficient performance, it is unnecessary for this court to address the issue of prejudice. Serigny, 610 So.2d at 860.
These assignments of error are without merit.

UNCONSTITUTIONAL VAGUENESS OF LSA-R.S. 14:130.1
In assignment of error number 7, the defendant contends the provisions of LSA-R.S. 14:130.1 are so ambiguous that the statute is unconstitutionally vague. Issues not submitted to the trial court for decision will not be considered on appeal. Constitutional issues are no exception. State v. Williams, 02-1030, 02-0898 (La. 10/15/02), 830 So.2d 984, 988. The defendant failed to challenge LSA-R.S. 14:130.1 in the trial court. Accordingly, consideration of this assignment of error is pretermitted.

PLEA AGREEMENT
In assignment of error number 8, the defendant argues she was entitled to enforcement of her plea agreement with the State. On January 9, 1995, when the defendant was under indictment for first degree murder, she entered into a plea agreement with the State in order to avoid the possibility of the death penalty. The plea agreement indicated the defendant had tendered a plea of guilty to the lesser, included offense of accessory after the fact, with the understanding that she was to receive the maximum sentence of five years. The agreement set forth that the defendant would give full and truthful testimony concerning the death of George Taylor and of the participation of Paul Weber in Taylor's death.
After the State indicated it would break the plea agreement, the defense moved to enforce the plea agreement. At the hearing on the defendant's motion, the State indicated it had letters revealing that the defendant and Weber were communicating concerning ways for the defendant to back out of her statement, that the defendant had attempted to many Weber, and that the defendant had given Weber's attorney a statement claiming her statement to the police was given under duress. The State indicated it could not in good conscience present a witness it knew would lie.
The trial court granted the defendant's motion to enforce the plea bargain, noting that the defendant fully embraced the statement she had given to the police. The State applied to this court for supervisory writs, and this court reversed the ruling. Thereafter, this court denied the defendant's application for rehearing, and the Louisiana Supreme Court denied the defendant's application for supervisory writs. State v. Zachary, 95-2369 (La. App. 1 Cir. 4/19/96), writ denied, 96-1288 (La. 9/13/96), 679 So.2d 104.
The defendant offers no reason and the record provides no basis for this court to reverse itself concerning a ruling made eleven years ago, upon which this court denied rehearing, and upon which the Louisiana Supreme Court denied review.
This assignment of error is without merit.

MOTION TO SUPPRESS
In assignment of error number 9, the defendant contends the trial court erred in denying the motion to suppress the oral statement given by the defendant to Livingston Parish Sheriffs Office Chief of Detectives Kerney Foster on July 9, 1993, at 11:45 p.m. The defendant argues the trial court incorrectly applied the burden of proof at the hearing on the motion to suppress, and thus, the case must be remanded under State v. Rowell, 505 So.2d 978, 980-981 (La. App. 3 Cir.), writ granted, 506 So.2d 1216 (La. 1987), affirmed and amended, 517 So.2d 799 (La. 1988). The defendant also argues the trial court abused its discretion in denying the motion to suppress because Chief Foster testified that the defendant was still drunk when he spoke to her.
A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. LSA-C.Cr.P. art. 703A. On the trial of the motion to suppress, the burden of proof is on the defendant to prove the ground of his motion, except that the State shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant. LSA-C.Cr.P. art. 703D.
It is well settled that for a confession or inculpatory statement to be admissible into evidence, the State must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menaces, threats, inducements, or promises. LSA-R.S. 15:451. Additionally, the State must show that an accused who makes a statement or confession during custodial interrogation was first advised of her Miranda rights. State v. Plain, 99-1112 (La. App. 1 Cir. 2/18/00), 752 So.2d 337, 342.
The admissibility of a confession is, in the first instance, a question for the trial court; its conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession are accorded great weight and will not be overturned unless they are not supported by the evidence. Whether a showing of voluntariness has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. The trial court must consider the totality of the circumstances in deciding whether a confession is admissible. Plain, 752 So.2d at 342.
Prior to trial, the defense moved to suppress oral inculpatory statements and/or confessions elicited by agents of the State of Louisiana as obtained through threats of violence and duress and in violation of the defendant's rights under the United States Constitution and Louisiana Constitution. The State called Chief Foster to testify at the hearing on the motion to suppress, but then indicated it believed the burden of proof was on the defense because the defense was moving to suppress a statement. The defense agreed and questioned Chief Foster on direct examination.
No substantial rights of the accused were affected by the defense questioning Chief Foster on direct and redirect examination, rather than on cross-examination. The State established the foundation for the admissibility of the evidence that was the subject of the motion to suppress, and the defense was not denied any opportunity to challenge that foundation. Chief Foster indicated that the defendant had been arrested for public intoxication after she was discovered at the mini warehouse. Chief Foster advised the defendant of her Miranda rights prior to questioning her. He conceded in his report that the defendant was drunk when questioned at the Livingston Parish Jail and that he could make little sense of what she was saying. He indicated, however, the defendant was not so drunk that she could not understand her rights or answer his questions. The defendant responded well to certain questions but changed the subject when questioned about the victim. Chief Foster also conceded that he did not rely on the waiver for a search that he obtained from the defendant at 1:15 a.m. Although he felt the defendant understood what she was doing when she signed the waiver, he explained that a search warrant is better if the police have time to obtain a warrant, and the defendant was in jail. Also, Chief Foster was reluctant to rely on a waiver from the defendant because she had been arrested for simple drunk.
Chief Foster indicated the defendant entered the room to speak with him at 11:45 p.m. under her own power, without bumping into anything, and without falling down. She did not have trouble finding a chair. She did not fall asleep while being questioned and was not in a daze during questioning. She did not have slurred speech. After being advised of her Miranda rights, the defendant indicated she understood those rights. Chief Foster indicated that approximately two and one-quarter hours passed between the time the defendant was arrested and the time he questioned her at the Livingston Parish Jail. He also indicated that the defendant supplied the information listed on her booking sheet (address, telephone number, date of birth, social security number, emergency contact, emergency contact's telephone number) and, thus, understood the questions asked. The trial court denied the motion to suppress, citing Chief Foster's testimony and the questions that were asked and answered.
At trial,[4] Chief Foster testified that, on July 9, 1993, at 11:45 p.m., he questioned the defendant after advising her of her Miranda rights. In response to questioning, the defendant indicated she and Weber had the victim's car, and she had last seen the victim that afternoon. When Chief Foster asked the defendant where the victim was located, she turned her head and started talking about her children.
Additionally, we find no abuse of discretion in the trial court's denial of the motion to suppress. Chief Foster testified that even though the defendant was drunk, she was advised of and understood her Miranda rights prior to questioning. He also indicated the defendant was able to navigate around the interrogation room, was alert during questioning, and competently answered numerous questions. The trial court found the testimony of Chief Foster credible, and there is no basis to overturn that determination.
This assignment of error is without merit.

INCOMPLETE RECORD
In assignment of error number 10, the defendant argues critical omissions from the record occurred when, on numerous occasions during trial, counsel or other individuals approached the bench and engaged in conferences with the judge that were unrecorded. She specifically cites the court interviewing prospective jurors Evans, Lee, and Lenard at unrecorded bench conferences. The defendant also references other unrecorded bench conferences that occurred later at trial.
Louisiana Constitution article I, section 19, guarantees defendants a right of appeal based upon a complete record of all evidence upon which the judgment is based. Additionally, LSA-C.Cr.P. art. 843 in pertinent part provides:
In felony cases ... the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. See State v. Robinson, 387 So.2d 1143, 1144-1145 (La. 1980) (reversal required when record failed to contain the testimony of a state and a defense expert witness); State v. Ford, 338 So.2d 107, 110 (La. 1976) (reversal required when record missing the testimony of four state witnesses and the voir dire of prospective jurors). Conversely, inconsequential omissions or slight inaccuracies do not require reversal. State v. Scott, 06-1103 (La. App. 1 Cir. 12/28/06), 952 So.2d 60, 67, writ denied, 07-0275 (La. 10/5/07), 964 So.2d 384.
The Louisiana Supreme Court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of Article 843. Scott, 952 So.2d at 68. However, the Article 843 reference to "objections" and "arguments" generally only applies to objections made in open court and the arguments of counsel in closing, because only those objections and arguments rise to a level of materiality sufficient to invoke Article 843. Scott, 952 So.2d at 68. Similarly, the reference in LSA-Const. art. I, § 19 to record evidence does not encompass bench conferences, at least not those that do not satisfy the materiality requirements of Article 843. Scott, 952 So.2d at 68.
Moreover, the defendant fails to demonstrate any specific prejudice that she suffered as a result of the bench conferences not being transcribed. Nothing in the record suggests that the bench conferences had any discernible impact on the proceedings. See Scott, 952 So.2d at 68. In particular, Evans, Lee, and Lenard did not serve on the jury. Accordingly, no reversible error occurred.
This assignment of error is without merit.
CONVICTION, HABITUAL OFFENDER ADJUDICATION, AND SENTENCE AFFIRMED.
NOTES
[1] The record does not reflect a ruling on the third motion to quash the habitual offender bill but indicates a hearing on the motion was held, and the matter was continued on motion of the defense.
[2] Although the trial court failed to state that the defendant's sentence was to be served at "hard labor," it did sentence the defendant to "twenty (20) years for the habitual offender petition, as in 14:130.1-B-1." Louisiana Revised Statutes 14:130.1B(1) provides for a sentence at hard labor. Additionally, the sentencing minutes reflect that the sentence was to be served with the Department of Corrections.
[3] Under Apprendi, the statutory maximum is the maximum sentence a judge may impose solely on the basis of the facts as reflected in the verdict or admitted by the defendant. Blakely v. Washington, 542 U.S. 296, 303-304, 124 S.Ct. 2531, 2537, 159 L.Ed.2d 403 (2004).
[4] In determining whether the ruling on the defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may also consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So.2d 1222, 1223 n. 2 (La. 1979).